GULOTTA, Judge.
The City of New Orleans appeals from a trial judge’s award of $544,101.19[1] to a plaintiff, a college student, who suffered a gunshot wound to his upper right thigh when struck by a stray bullet from a policeman’s pistol. Because the City stipulates that it was solely liable under the doctrine of respondeat superior, the sole issue is quantum. We conclude that the amount awarded is excessive, and reduce the award to the sum of $84,101.19.
On March 1, 1981, while watching the Bacchus carnival parade on Canal Street, John Barker was accidentally struck in his upper right thigh by a bullet from a New Orleans policeman’s .45 caliber pistol. During emergency treatment at Charity Hospital, it was determined that the bullet was lodged in soft tissue, and the treating physicians decided that it should be left alone rather than surgically removed. Plaintiff was discharged from the hospital on March 8, and resumed his university studies a week later.
In its claim that the award is excessive, the City points out that plaintiff has only a minimal 8% disability of the leg as a result of the accident, has successfully completed his college studies, and is now married and the father of two children. On the other hand, plaintiff contends that the award is justified because he continues to feel pain in his right leg, has suffered nightmares and psychological problems, and faces either major surgery to remove the bullet or the possibility of future lead poisoning if the bullet is not removed.
Dr. James A. Freeman, an expert in family practice and pathology, first saw plaintiff on April 15, 1982, about one-year post-accident, with complaints of a “pulling sensation” in his right groin adjacent to the injury. This physician testified that the bullet is located close to the hip joint in front of the upper end of the femur, near the femoral artery. Although Dr. Freeman testified that tests run on plaintiff were negative for lead poisoning, he compared X-rays and concluded that there had been some movement in the bullet since the accident. This indicated to this expert that lead poisoning could occur in the future if the bullet moved into the fluid near the hip joint and began to erode.
Although there is some danger of severing the artery during surgery, Dr. Freeman testified that a good surgeon would have no difficulty in removing the bullet. Based on this observation, he recommended this surgery. On plaintiff’s complaints of soreness, this physician suggested that plaintiff refrain from any activities involv *538 ing walking, running, standing or driving for long periods of time. Although he could not calculate long term disability or predict whether plaintiff would have any further complications, Dr. Freeman felt that the possibility of lead poisoning is “significant” unless the bullet is removed.
Dr. David G. Kline, a neurosurgeon, stated in his report that plaintiff has no evidence of significant pathology involving nerves in his leg that would warrant surgery, even though his mild symptoms of tingling and decreased sensation may be due to mild involvement of the femoral nerve sensory branch. Dr. Kline noted that the bullet appeared to be lodged in soft tissue and that patients who encounter difficulty with lead poisoning usually have the bullet lodged in or near a major joint, unlike plaintiff. This physician stated that the bullet could be removed by a well-skilled orthopedic or general surgeon.
The trial judge also had the benefit of the written report of Dr. Gary T. Guidry, an orthopedist, who noted that plaintiff had complained on November 18, 1982 of aching sensations in the right hip area. Although this physician found plaintiff had a full range of motion in the hip and a good gait, he felt that plaintiff may encounter difficulty in finding employment in the heavy labor market and would be a good candidate for vocational rehabilitation because of the bullet fragment adjacent to the bone.
Dr. Donald C. Faust, an orthopedic surgeon, examined plaintiff on October 14, 1984, on complaints of discomfort when ascending stairs, and when walking or driving for any extended period. Dr. Faust found that plaintiff has suffered a mild loss of motion of the hip, but he recommended that plaintiff use his leg fully without any further treatment. This physician concluded that plaintiffs loss of function to his extremity was about 8% and further noted that the risk of removing the bullet is much greater than leaving it in place.
Dr. Charles T. O’Connor, a psychiatrist, first saw plaintiff on October 10, 1984, on complaints of recurring nightmares about the accident and a limiting of his physical activities to guard his right thigh and hip area. Dr. O'Connor recommended desensitization and bio-feedback therapy, but plaintiff has not undergone the treatment. On June 7, 1985, this physician examined plaintiff again and found that he had not changed greatly, although his nightmares had subsided and he had forced himself to return to the area of the accident.
A second psychiatrist, Dr. David Shra-berg, evaluated plaintiff on October 19, 1984. At that time, plaintiff complained of discomfort in the area of the bullet, fears of walking and exercising, and recurring nightmares about being shot. Dr. Shra-berg stated that plaintiff’s mental status examination was within normal limits without evidence of severe psychotic sympto-mology or neurosis. He stated that plaintiff does not have post-traumatic stress disorder or any chronic disabling psychiatric impairment, but has rather an adjustment disorder that is limited to the gunshot incident. This physician saw no medical or psychological reason for plaintiff to curtail his physical activities and felt that the shrapnel type injury should be left alone. He further felt that plaintiff has no physical limitations and that his psychological limitations appear to be exaggerated beyond the proportion of the sustained injury. Dr. Shraberg saw no reason for further treatment and felt that plaintiff should “pick up his life where he left off”.
Corroborated by a friend who was with him at the shooting, plaintiff testified at length about the hysteria and chaos at the accident scene. He related that he had been embarrassed as TV cameras focused on him after the shooting and that he had feared that he might lose his leg or be paralyzed. He further described his pain during an angiogram at the hospital and his difficulty in resuming walking and attending classes in the weeks following the accident.
Although plaintiff has done renovation work on his apartment since the accident, he testified that his leg bothered him during that work and still hurts daily when he uses his stairway, when the weather changes, when he attempts to play golf, or *539 when he drives for long distances. He stated that he has changed his formerly athletic lifestyle, has gained 25 pounds, and is unable to do any exercises to keep himself in physical condition.
Barker further testified that he suffered nightmares of the incident and is not fond of violent television shows. He is confused about the conflicting medical opinions on whether to leave the bullet in or have it removed, and whether to restrict his activities or use his leg fully.
We note, in passing, that we do not have the benefit of a meaningful statement of the trial judge’s reasoning in this case. After the City Attorney requested written reasons for judgment, the trial judge simply assigned the following remark: “Considering the law and the evidence and the stipulation of liability, the court is of the opinion that plaintiff John Barker should be awarded and is entitled to $544,101.19 for damages sustained by him in these proceedings.” Such reasons are not very helpful in our review of the quantum of the award since they do not specify the nature of plaintiffs injuries or any other particular facts that impressed the trial judge in making the award.
In reviewing damage awards, we look first to the particular injuries and their effect on the plaintiff to determine if the trier of fact has abused his much discretion in making the award. LSA-C.C. Art. 2324.1; Reck v. Stephens, 373 So.2d 498 (La.1979). Our analysis of the facts in this case compels us to conclude that the trial judge did indeed abuse his discretion in awarding plaintiff $535,000.00 in general damages for this injury.
Although the evidence would support conclusions that plaintiff did in fact suffer fear, humiliation, embarrassment and pain as a result of this unfortunate gunshot wound, he has suffered little disabling or physical or psychological injury. Physically, he continues to suffer some tingling and loss of sensation in his upper right thigh and has restricted his activities, but he has continued to function as a capable adult to the extent of completing his education, marrying, fathering two children, and renovating his apartment. Although he has been certified for vocational rehabilitation, his disability of the lower leg is only 8%, and there is no evidence that he has suffered any occupational loss or economic damage.
Psychologically, though plaintiff has had some difficulty adjusting to the shooting incident, the undipsuted medical evidence indicates that he is suffering only an adjustment disorder and does not have any chronic or severe mental problems. Plaintiff testified that he has managed to return to New Orleans and the scene of the accident without major difficulty, and that it has been a “while” since he has had a nightmare about the shooting incident.
Although there is a possibility of lead poisoning over a long period of time if the bullet migrates to his hip joint, the evidence indicates that surgery to remove the pellet can be performed by a competent surgeon should plaintiff elect it. Even though the medical evidence was conflicting on whether the bullet should be removed or left alone, plaintiff is certainly not confronted with an inoperable condition that dooms him to a chronic risk of lead poisoning.
We distinguish Martin v. City of New Orleans, 678 F.2d 1321 (5th Cir.1982), relied on by plaintiff in support of the award. In Martin, a federal appeals court declined to disturb an award of $500,000.00 to a plaintiff with a bullet “lodged in the back of his neck, a fraction of an inch from his spinal cord”. The situation in the cited case is unlike the instant one where plaintiff has a bullet embedded in the soft tissue of his upper thigh without danger of paralysis or immediate life-threatening consequences. Furthermore, the federal appeals court in Martin stated that it would reverse an award for excessiveness only when it was “so gross ... as to be contrary to right reason” or when it “clearly exceeds the amount that any reasonable man could feel the claimant is entitled to.” Because this federal standard of review on quantum differs from our standards under Louisiana law, we do not find the Martin decision persuasive in our case.
*540 A more truly similar injury existed in Kyle v. City of New Orleans, 357 So.2d 1389 (La.App. 4th Cir.1978), writ denied 359 So.2d 1307 (La.1978), where a plaintiff was awarded $25,000.00 for a 30% permanent disability from a comminuted fracture of the lower femur and damage to the femoral artery from a gunshot wound. Likewise, in Coleman on Behalf of Mathews v. Moore, 426 So.2d 652 (La.App. 1st Cir. 1982), writ denied 433 So.2d 149 (La.1983), a $20,000.00 award was affirmed where a plaintiff suffered a limp and loss of sensation in her leg as a result of a gunshot wound to her left buttock. Although these cited cases did not involve unremoved pellets, they are nonetheless akin to the instant case in that the bullet in plaintiffs thigh can be extracted by a competent surgeon.
Considering the particular injuries and their effect on the plaintiff in the instant case, we conclude that the general damage award of $535,000.00 must be lowered to the sum of $75,000.00, which is the highest point that is reasonably within the discretion afforded the trial judge. Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1977). The stipulated amount of $9,101.19 in special damages remains unchanged.
Accordingly, the total award in favor of plaintiff in the sum of $544,101.19 is reduced to the sum of $84,101.19. In all other respects, the judgment is affirmed.
AMENDED AND AFFIRMED.
REDMANN, C.J., dissents.

. Stipulated medical expenses were $9,101.19.